IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM MCMURTRIE | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION |
| vs. | : | |
| | : | NO. 09-cv-944 |
| SPECIALTY MINERALS, INC. | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM OPINION

GOLDEN, J.                                                                   AUGUST 13, 2009

Before the Court is Defendant Specialty Minerals, Inc.'s Motion to Dismiss Plaintiff William McMurtrie's Amended Complaint, which alleges one count of retaliation under Section 510 of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140. (Doc. No. 9). For the reasons that follow, Defendant's Motion is granted and Plaintiff's Amended Complaint will be dismissed.[1]

## FACTUAL BACKGROUND[2]

On January 29, 2007, a manager for Defendant Specialty Minerals, Inc. informed Plaintiff William McMurtrie that he was being terminated from his employment with Defendant as part of a

---

[1] Plaintiff's Complaint was initially filed in the Pennsylvania Court of Common Pleas of Northampton County on February 12, 2009. (Doc. No. 1). Defendant removed this action to federal court on March 5, 2009. (Id.). Defendant's initial Motion to Dismiss was filed on March 12, 2009. (Doc. No. 3). Pursuant to Local Rule of Civil Procedure 7.1(c), Plaintiff's response to Defendant's Motion was due on March 26, 2009. Plaintiff did not timely respond. On April 3, 2009, a telephonic status conference was held regarding Plaintiff's failure to respond to Defendant's Motion. (Doc. No. 6). During this telephonic conference, Plaintiff informed the Court that an Amended Complaint had been filed in this matter, though the Amended Complaint had not yet been docketed at the time of the conference. During the conference, the Court gave Plaintiff until 1:00 p.m. on April 6, 2009, to file an Amended Complaint or face dismissal of his action. Plaintiff's Amended Complaint was subsequently docketed on April 6, 2009, with a filing date of April 3, 2009. (Doc. No. 5). The Court then denied as moot Defendant's initial Motion to Dismiss. (Doc. No. 7). Defendant subsequently filed the pending Motion to Dismiss Plaintiff's Amended Complaint. (Doc. No. 9).

[2] Unless stated otherwise, all facts in this section are adopted from Plaintiff's Amended Complaint and are stated in the light most favorable to Plaintiff.

reduction in force.  (Am. Compl. ¶¶ 9-10).  Plaintiff had been employed by Defendant as a Senior Technician for over twenty-six years, and he had been out of work on short term disability since October 30, 2006.  (Id. ¶¶ 3, 8).  As of January 29, 2007, Plaintiff was four weeks away from turning 55 years old, at which time he would have been eligible for early retirement benefits under Defendant's early retirement program.  (Id. ¶ 13).

Central to this case is what allegedly occurred next, several weeks after Defendant's January 29, 2007 termination decision.  On February 20, 2007, Plaintiff signed a severance agreement, also referred to as the "General Release and Agreement."  (Id. ¶¶ 14, 35).  Plaintiff claims that he signed the Release Agreement because Defendant had told him that his termination was the product of a reduction in force.  (Id. ¶ 14).  On February 28, 2007—at least eight days after signing the Release Agreement and approximately one month after Defendant's termination decision—Plaintiff asked a doctor working on behalf of Defendant "about the possibility of going on Long Term Disability in order to save his job." (Id. ¶ 15).  Rather than medically examining Plaintiff to determine his eligibility, Defendant's doctor stated that Plaintiff had been out of work on short term disability too long and tried to dispute Plaintiff's claim that he was disabled.  (Id. ¶¶ 16-17).  Defendant's doctor concluded that Plaintiff was not eligible for long term disability benefits.  (Id. ¶ 18).  Plaintiff avers that "being on Long Term Disability might have prevented his termination." (Id.).  Plaintiff claims that the statements of Defendant's doctor "were intended to prevent the plaintiff from receiving any [long term disability] benefits" and were motivated to force Plaintiff "to quit his job and not stay on as an employee until he reached age 55," at which time he may have been able to obtain early retirement benefits.  (Id. ¶¶ 13, 31, 34).[3]

---

[3] Plaintiff received long term disability benefits on July 9, 2007.  (Am. Compl. ¶ 20).  Plaintiff further claims that Defendant filled his position "despite the fact that he was told . . . [that] his layoff was due to a Reduction in Force and despite the fact that he signed his release [on February 20, 2007] after being told that he was being

**STANDARD**

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 1953 (2009) (internal quotations and citations omitted) (holding that the pleading standard articulated in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), applies to "all civil actions" and noting that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"). The court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998). A court shall not inquire into "whether the plaintiffs will ultimately prevail, only whether they are entitled to offer evidence to support their claims." Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996). Thus, "a complaint will not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Johnsrud v. Carter, 620 F.2d 29, 33 (3d Cir. 1980).

**ANALYSIS**

Plaintiff asserts only one count in his Amended Complaint—namely, that Defendant violated Section 510 of the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1140. Plaintiff alleges that Defendant violated Section 510 of ERISA when, on February 28, 2007, Defendant, through its doctor, misrepresented to Plaintiff that he did not have a right to receive long term disability benefits in order to induce Plaintiff to quit his employment prior to reaching age 55. According to the

---

downsized." (Id. ¶ 21).

Amended Complaint, these statements were made for the purpose of interfering with Plaintiff's right to collect long term disability benefits—the ERISA-protected benefits in question—which would have enabled him to remain as an employee until the age of 55 to receive early retirement benefits. (Am. Compl. ¶¶ 13, 29, 31-34, 42).[4]

Section 510 of ERISA states, in relevant part, that "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the [employee benefit] plan, this subchapter, or the Welfare and Pension Plans Disclosure Act." 29 U.S.C. § 1140. "Section 510 was enacted by Congress primarily to prevent employers from discharging or harassing their employees in order to keep them from obtaining ERISA protected benefits." Battoni v. IBEW Local Union No. 102 Employee Pension Plan, 569 F. Supp. 2d 480, 494 (D.N.J. 2008) (citing Kowalski v. L&F Prods., 82 F.3d 1283, 1287 (3d Cir. 1996)). To state a Section 510 claim, a plaintiff must allege that the defendant "had the specific intent to violate ERISA" and "made a conscious decision to interfere with the employee's attainment of pension eligibility or additional benefits." Jakimas v. Hoffmann-La Roche, Inc., 485 F.3d 770, 785 (3d Cir. 2007) (internal quotations omitted).[5] To state a *prima facie* case for a violation of Section 510 of ERISA, a plaintiff must demonstrate (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the

---

[4] In his Amended Complaint, Plaintiff seeks judgment "in an amount in excess of the arbitration limits established by the United States District Court for the [E]astern [D]istrict of Pennsylvania." Thus, pursuant to Rule 53.2(3) of the Local Rules of Civil Procedure, Plaintiff must be seeking compensatory damages in excess of $150,000. "[R]emedies available for a violation of § 510 are . . . limited to those set forth in § 502(a) of ERISA." Eichorn v. AT&T Corp., 484 F.3d 644, 652 (3d Cir. 2007), cert. denied, 128 S. Ct. 709 (2007); see 29 U.S.C. § 1132(a). "By its terms, section 502—the remedies provision for section 510—provides only for equitable relief." Spinelli v. Gaughan, 12 F.3d 853, 857 (9th Cir. 1993); see also Eichorn, 484 F.3d at 654-55.

[5] "Proof that the plaintiff lost benefits because of termination alone is not enough." Jakimas, 485 F.3d at 785. "Proof that the termination prevented the employee from accruing additional benefits through more years of service alone is not probative of intent." Id.

attainment of any right to which the employee may become entitled.  Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 522 (3d Cir. 1997); accord Gravalik v. Cont'l Can Co., 812 F.2d 834, 852 (3d Cir. 1987), cert. denied, 484 U.S. 979 (1987).[6]

In addressing whether Plaintiff has sufficiently alleged a *prima facie* case for the existence of a Section 510 violation, the Court's analysis will focus exclusively on the first element of a *prima facie* case—namely, whether Plaintiff has sufficiently alleged "prohibited employer conduct" on the part of Defendant.  The "prohibited employer conduct" element under Section 510 includes an employer's decision to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary."  29 U.S.C. § 1140.  Consequently, the Court must first determine what "prohibited employer conduct" is specifically alleged in Plaintiff's Amended Complaint.

Plaintiff claims that Defendant's motive for lying to Plaintiff about his right to receive long term disability benefits on February 28, 2007, was to force him to quit his job, thereby preventing him from reaching the age of 55 while employed with Defendant.  (Am. Compl. ¶ 34).  Here, the alleged "prohibited employer conduct" taken for the purpose of interfering with the attainment of any rights to which Plaintiff may have been entitled allegedly occurred *solely* on February 28, 2007—at least eight days after Plaintiff signed the Release Agreement and nearly one month after Defendant's termination decision.  (Id. ¶ 44).  Plaintiff specifically contends that "the wrongdoing in question [by Defendant] occurred ***after*** the release had been signed" on February 20, 2007.  (Pl.'s Br. at 13; accord Am. Compl.

---

[6] An employee may use either direct or circumstantial evidence to establish the employer's intent to violate ERISA.  See DiFederico v. Rolm Co., 201 F.3d 200, 205 (3d Cir. 2000).  When an employee uses only circumstantial evidence to establish specific intent, the court applies a burden-shifting analysis, similar to that applied in Title VII employment discrimination claims.  Id.; accord Gravalik, 812 F.2d at 851.  "If the [employee] establishes a *prima facie* case by a preponderance of the evidence, the burden of production shifts to the employer to introduce admissible evidence of a legitimate, nondiscriminatory reason for its challenged actions."  Gravalik, 812 F.2d at 853.  "If the employer fails to rebut the presumption of discrimination that arises from the [employee's] *prima facie* case, the district court must enter judgment for the [employee]."  Id.

¶¶ 28, 44).  The Release Agreement signed by Plaintiff, which Plaintiff also argues is invalid, only released Defendant from liability for causes of action arising up to the date of the execution of the Agreement—February 20, 2007.  (Am. Compl. ¶ 37).[7]

Notwithstanding Plaintiff's contention that the "underlying thrust of the case . . . [is] that the Plaintiff was tricked into leaving his employment before reaching age 55," (Pl.'s Br. at 10; accord Am. Compl. ¶ 34), Plaintiff is not alleging that Defendant's unlawful conduct was Defendant's decision to discharge Plaintiff—a decision that occurred *prior to February 20, 2007* and is covered by the Release Agreement assuming its validity.  (Pl.'s Br. at 6-8).  Put another way, Plaintiff does not contend that the alleged misrepresentations made by Defendant's doctor on February 28, 2007, are circumstantial evidence of the unlawfulness of Defendant's decision to discharge Plaintiff prior to February 20, 2007.  Rather, Defendant's unlawful conduct, as alleged in the Amended Complaint, consists of Defendant's inaccurate statements made *on February 28, 2007*—a date both well after Defendant's termination decision and not captured by the Release Agreement—regarding Plaintiff's eligibility for long term disability benefits and the discriminatory effects of these statements.  (Am. Compl. ¶¶ 28, 44); see, e.g., Anderson v. Consol. Rail Corp., No. 98-6043, 1999 WL 239054, at *6 (E.D. Pa. Apr. 7, 1999) (noting that plaintiffs could not be alleging impermissible discharge for the purpose of interfering with

---

[7] For the purposes of this ruling, the Court need not examine the validity of the Release Agreement signed on February 20, 2007.  Indeed, much of the briefing papers address the validity and scope of the Release Agreement.  Defendant claims that the Release Agreement bars Plaintiff's Section 510 claim because Plaintiff's allegations are "not about [long term disability] benefits themselves" but are "about preventing [Plaintiff's] 'termination' by going on [long term disability]."  (Def.'s Br. at 5).  Defendant argues that its termination decision was made well before February 20, 2007 and is therefore covered by the Release Agreement.  (Id.).  However, Plaintiff is alleging that his claim is solely the product of Defendant's misrepresentations occurring on February 28, 2007—a date not encompassed by the Release Agreement's language.  (Am. Compl. ¶ 44).  According to Plaintiff's Amended Complaint, "only causes of action arising up to the date of the execution of the Agreement [February 20, 2007] are waived by the said release language."  (Id. ¶ 37) (emphasis added).  Taking Plaintiff's allegation as true that Defendant's actionable conduct occurred on February 28, 2007, and that this conduct is outside the scope of the Release Agreement, the Court need not examine the validity of the Release Agreement.  Rather, the Court need only evaluate whether Defendant's alleged February 28, 2007 misrepresentations state a claim under Section 510 of ERISA.

-6-

employee rights under Section 510 because, "[a]lthough plaintiffs allege that [defendant's] exclusion of them from the [voluntary separation program] was 'tantamount to a discharge,' they concede that they had already been discharged"), aff'd, 297 F.3d 242 (3d Cir. 2002).

As a result, because the alleged "prohibited employer conduct" is not Defendant's decision to discharge Plaintiff on January 29, 2007, Plaintiff must be claiming that Defendant's alleged misrepresentations on February 28, 2007 discriminated against Plaintiff under Section 510. Plaintiff's Amended Complaint itself states that Defendant's conduct was "*discriminatory* and unlawful," and it was this conduct that led to a denial of employee benefits. (Am. Compl. ¶ 33) (emphasis added). As one commentator has noted, the term "discriminate against" in Section 510 "is a catchall provision, intended to outlaw unfavorable changes in the terms and conditions of employment not otherwise specifically enumerated, including, for example, demotion, transfer, or loss of seniority." See Peter J. Wiedenbeck, ERISA in the Courts 199 (2008). Thus, the Court must determine whether Plaintiff sufficiently alleges discriminatory conduct to satisfy the "prohibited employer conduct" requirement of Section 510. Plaintiff has failed to do so.

In the Third Circuit, actionable discrimination under Section 510 is limited to that which affects the employee-employer relationship. Fischer v. Phila. Elec. Co., 96 F.3d 1533, 1543 (3d Cir. 1996) (Section 510 ERISA claims are "limited to actions affecting the employer-employee relationship, not mere changes in the level of benefits.") (internal quotations omitted), cert. denied, 520 U.S. 1116 (1997); Habererrn v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, 24 F.3d 1491, 1503 (3d Cir. 1994) ("[C]ourts construing 'discriminate' have concluded . . . that the term should be limited to actions affecting the employer-employee relationship, and we adhere to this construction."), cert. denied, 513 U.S. 1149 (1994); see also Anderson, 1999 WL 239054, at *6 (dismissing ERISA Section 510 discrimination claim at Rule 12(b)(6) stage because, since plaintiffs had been discharged prior to

the amendments to the pension plan establishing a voluntary separation program, the amendments "did not affect the employer-employee relationship in any way").

The Court concludes that, as alleged, the misrepresentations made by Defendant on February 28, 2007, could not have impacted the employee/employer relationship between Plaintiff and Defendant.  Therefore, Plaintiff has failed to plead discriminatory "prohibited employer conduct" under Section 510.  Defendant's alleged misrepresentations were made on February 28, 2007—eight days after Plaintiff signed a Release Agreement on February 20, 2007, and approximately one month after Plaintiff had been selected for termination.  (Am. Compl. ¶¶ 9, 28, 35, 44).  On February 28, 2007, Plaintiff could not have been "tricked" into quitting a job because, *before* the alleged improper conduct, (1) a termination decision had already been made and (2) Plaintiff acknowledged the conclusion of the employment relationship in executing the Release Agreement.  (See Def.'s Br. at 5).  As a result, regardless of Defendant's motive, the alleged misrepresentation regarding Plaintiff's long term disability eligibility could not have impacted any employer/employee relationship.  See Odneal v. Pacific Gas and Elec. Co., 948 F.2d 1293, 1991 WL 256524, at *3 (9th Cir. 1991) (table decision) (holding that alleged misrepresentations by defendant employer, while plaintiff was employed by defendant, that an early retirement program would not be initiated were, by themselves, "not tantamount to a change in the employment relationship" because they were not accompanied by, for example, an effort by defendant employer to either make plaintiff's working environment uncomfortable or demote plaintiff); Rea v. Hershey Co. 2005 Enhanced Mut. Separation Plan, No. 06-1920, 2007 WL 776882, at *4 (M.D. Pa. Mar. 12, 2007) (holding at Rule 12(b)(6) stage that plaintiff's decision to leave defendant's employment after plaintiff concluded that he was eligible for defendant's severance program did not mean that the defendant's *subsequent* decision while plaintiff was still employed to deny plaintiff's severance application, regardless of its motive, actually affected the

employment relationship).[8]  Accordingly, this is a case in which, assuming the truthfulness of Plaintiff's allegations and all reasonable inferences derived therefrom, Plaintiff has failed to nudge his Section 510 claim across the line from conceivable to plausible.  See Twombly, 550 U.S. at 570 (holding that a plaintiff must nudge his claim "across the line from conceivable to plausible" to survive a motion to dismiss).[9]

An appropriate order will be docketed.

---

[8] See also Huntsinger v. Shaw Group, Inc., 410 F. Supp. 2d 968, 975 (D. Or. 2006) (holding that the argument that a former employee was discriminated against after he was terminated because he was deprived of information necessary to convert his life insurance policy "is insufficient to state a § 1140 discrimination claim" because "[a]ny alleged discrimination against [the former employee] occurred after he was terminated and did not affect his employment relationship"), aff'd, 268 F. App'x 518 (9th Cir. 2008); Hamilton v. Mecca, Inc., 930 F. Supp. 1540, 1551 n.20 (S.D. Ga. 1996) (holding that "[o]nce [defendant employer] had terminated [plaintiff's] employment, there was obviously no employer-employee relationship to be affected by [defendant employer's] actions"); Mansfield v. Lucent Techs., No. 04-3589, 2006 WL 2040406, at *3 (D.N.J. Jul. 20, 2006) (holding that plaintiff "cannot state a claim under Section 510 since he was not [an employee of defendant] . . . at the time [defendant employer's disability provider] mis-classified him as a retired employee"); Serv. Employees Int'l Union v. Indep. Mgmt. Co., No. 04-0067, 2005 WL 3488718, at *3 (W.D. Pa. Dec. 20, 2005) (holding on summary judgment that, because plaintiffs were not employees of defendants, plaintiffs cannot demonstrate "prohibited employer conduct").

[9] Defendant has presented evidence outside the pleadings indicating that, despite Plaintiff's selection for layoff in late January 2007, Defendant actually "bridged" Plaintiff's employment until he reached age 55 in order for Plaintiff to receive early retirement benefits.  Defendant has also submitted evidence that, based on Defendant's established policy, Plaintiff was not eligible for long term disability benefits on February 28, 2007.  Plaintiff has not addressed these contentions.  The Court has not considered this evidence in its analysis and has instead solely relied on the allegations in Plaintiff's Amended Complaint in reaching its holding.